**ATLANTIC FISH & OYSTER CO.**

v.

**UNITED STATES.**

No. 50166.

United States Court of Claims.
Dec. 1, 1953.

James R. Zuckerman, Detroit, Mich., for plaintiff. Seymour J. Rubin, Wallace M. Cohen, Washington, D. C., Denenberg & Notkin, Chicago, Ill., and Landis, Cohen, Rubin, Schwartz & Gewirtz, Washington, D. C., were on the briefs.

Arthur E. Fay, Washington, D. C., with whom was Asst. Atty. Gen. Warren E. Burger, for defendant. Harry H. Davidson, White Plains, N. Y., was on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

MADDEN, Judge.

On May 4, 1949, the plaintiff and the Government made a contract under which the plaintiff was to deliver 30,000 pounds of Type III shrimp to the Government at its Quartermaster Market Center, San Francisco, California, on May 31. It was contemplated that the plaintiff would have the shrimp processed at the plant of the Clegg Shrimp Company of Port Lavaca, Texas. That Company's plant was to be one of the points where the Government would inspect the shrimp. The contract was signed on behalf of the Government by a contracting officer at the Quartermaster Center at Chicago, Illinois.

Prior to May 31, the delivery date, the plaintiff requested the Government's agent at Chicago to extend the time of performance to June 15. The plaintiff represented, falsely, that weather conditions along the Texas coast had made it impossible for shrimp boats to operate. The Government extended the time to June 15. On June 14, the plaintiff's supplier, the Clegg Company, had not begun to process any shrimp for the contract and on June 15 no shrimp had, of course, been delivered.

After June 15, and until June 21, the Government's contracting officer adopted an attitude of forbearance, hoping that the plaintiff would perform the contract. On June 17, the plaintiff was informed by its supplier, the Texas Fisherman's Cooperative, that it looked like the Government order could be filled in the following three days. The Government was advised of this statement. On June 21 and 22, at the request of the plaintiff, a Government inspector inspected and rejected all the shrimp the plaintiff had available at the Clegg plant, which was about 10,000 pounds. The reasons for the rejection were (1) part of the shrimp had been processed before the arrival of the inspector, and (2) the rest of the shrimp had been beheaded at sea. The first reason for rejection was valid. The second was not, but the inspector advised the plaintiff that if it obtained permission from the Quartermaster Center at Chicago for acceptance of the beheaded shrimp, he would pass them. The plaintiff did not seek that permission.

On June 21 the Chicago Center was told by the San Francisco Center that it had received no notice of shipment from the plaintiff; that shrimp stocks were running low, and that unless the plaintiff produced immediately it would be necessary to procure the shrimp on the open market. On that same day the Chicago Center telephoned the plaintiff that its contract was being terminated and that the Government was going to purchase shrimp elsewhere. On June 23 this same information was given in a letter to the plaintiff. The letter also advised the plaintiff that the excess cost of obtaining the shrimp elsewhere would be charged to the plaintiff.

After the telephone notice of termination, the Government took bids for the 30,000 pounds of shrimp, and let a contract to the lowest bidder, at a price substantially higher than the plaintiff's contract price. It demanded from the plain-

tiff the payment of the difference and, upon the plaintiff's failure to pay, collected the difference, which was $3,720, from the plaintiff by withholding it from other funds due the plaintiff.

The plaintiff claims that the termination was unjustified, and sues for the $3,720, and for the profits which it claims to have lost by the termination of the contract.

It is fairly apparent that the plaintiff did not want to perform the contract. It made no move to do so during the first contract period of May 4 to May 31. It gave a false reason for not doing so and has not yet offered a valid reason. During the extended contract period, June 1 to 15, it did not perform, and has offered no reason for not doing so. After June 15, the Government adopted an attitude of forbearance, still hoping for performance. That meant that if the plaintiff was diligent, it was entitled to be treated considerately, and not harmed by a harsh and inconsiderate rejection of its performance. It was treated considerately. It told the Government that it looked as if its order could be filled by June 20. On June 21 and 22 it had only one-third of the contract quantity available for inspection, of which a considerable quantity was properly rejected by the inspector. As to the quantity rejected because the shrimp had been beheaded at sea, it is probable that the inspector's mistake could have been cured by a telephone call to Chicago, and it is impossible to believe that if the plaintiff had wanted to perform its contract it would not have made that attempt. It was in no position to stand silent on its rights. The other party to the contract was, in this period, exercising forbearance, and the plaintiff should have been exercising diligence.

Because of the need for the shrimp, and the past failure of the plaintiff to perform, the contracting officer's forbearance was exhausted and he telephoned the plaintiff on June 21 terminating the contract. The plaintiff says that this termination was not put in writing until June 23, and was not effective until then. But it did advise the plaintiff of what

was coming and gave it a chance to minimize its loss, if it was threatened with any loss resulting from continued efforts to perform.

Our conclusion is that the plaintiff's contract was lawfully terminated, and that it is not entitled to recover. Its petition will be dismissed.

It is so ordered.

JONES, Chief Judge, and WHITAKER and LITTLETON, Judges, concur.